# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LISA DEATON,
    Plaintiff,

  vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-947
Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Lisa Deaton brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)
for judicial review of the final decision of the Commissioner of Social Security
("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and
supplemental security income ("SSI"). This matter is before the Court on plaintiff's Statement
of Errors (Doc. 12), and the Commissioner's response in opposition (Doc. 18).

## I.  Procedural Background

Plaintiff filed her applications for DIB and SSI in January and February 2013 alleging
disability since December 31, 2011 due to emphysema, high blood pressure/cholesterol, back
surgery, "degenerative," scoliosis, breast disease, ulcer, depression, and throat and teeth issues.
After initial administrative denials of her claim, plaintiff was afforded a hearing before
administrative law judge (ALJ) Anne Shaughnessy on August 26, 2015. On October 21, 2015,
the ALJ issued a decision denying plaintiff's DIB and SSI applications. Plaintiff's request for
review by the Appeals Council was denied, making the decision of the ALJ the final
administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to

perform the relevant previous employment, the burden shifts to the Commissioner to show that

the claimant can perform other substantial gainful employment and that such employment exists

in the national economy. *Rabbers,* 582 F.3d at 652; *Harmon v. Apfel,* 168 F.3d 289, 291 (6th

Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The [plaintiff met] the insured status requirements of the Social Security Act through December 31, 2016.

2. The [plaintiff] has not engaged in substantial gainful activity since December 31, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*) [].

3. The [plaintiff] has the following severe impairments: chronic obstructive pulmonary [d]isease (COPD); a major depressive disorder; and an anxiety disorder  (20 CFR 404.1520(c) and 416.920(c)).

4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can sustain a static set of tasks without fast pace.  She can interact with others superficially.  She should avoid concentrated exposure to extreme heat, extreme cold, humidity, fumes, odors, dust, and gases.

6. The [plaintiff] has no past relevant work (20 CFR 404.1565 and 416.965).

7. The [plaintiff] was born [in] . . . 1961 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the [plaintiff] does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[1]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from December 31, 2011, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-26).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In

---

[1]The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light unskilled occupations such as sorter (90,000 jobs nationally), packer (150,000 jobs nationally), and cleaner (100,000 jobs nationally). (Tr. 26, 54).

deciding whether the Commissioner's findings are supported by substantial evidence, the Court

considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the

disability determination. Even if substantial evidence supports the ALJ's conclusion that the

plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails

to follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746).

*See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not

giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Specific Errors

On appeal, plaintiff argues that the ALJ erred by: (1) failing to properly weigh the

opinion of Dr. Marvin Baula, M.D., plaintiff's treating psychiatrist; (2) failing to properly weigh

the opinion of her mental health therapist, Ms. Janice Whitecar, MSW, LSW, in accordance with

Social Security Ruling 06-03p; (3) failing to account for restrictions on voice communication;

and (4) relying on vocational expert testimony that did not accurately account for plaintiff's

impairments and thus does not constitute substantial evidence of plaintiff's ability to perform

specific jobs. (Doc. 12).

### 1. First assignment of error: Weight to the treating psychiatrist

Plaintiff alleges as her first assignment of error that the ALJ erred by failing to properly

weigh the opinion of her treating psychiatrist, Dr. Baula. It is well-established that the findings

and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of

treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529-30 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

"Treating-source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)). *See also Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). If the ALJ declines to give a treating source's opinion controlling weight, the ALJ must balance the factors set forth in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6) in determining what weight to give the opinion. *See Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544. These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), 416.927(c)(i)-(ii); *Wilson*, 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to

support or contradict the opinion. 20 C.F.R. §§ 404.1527(c)(3)-(6), 416.927(c)(3)-(6); *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.

"Importantly, the Commissioner imposes on its decision makers a clear duty to 'always give good reasons in [the] notice of determination or decision for the weight [given a] treating source's opinion.'" *Cole*, 661 F.3d at 937 (citation omitted). *See also Wilson*, 378 F.3d at 544 (ALJ must give "good reasons" for the ultimate weight afforded the treating physician opinion). Those reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Cole*, 661 F.3d at 937. This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson*, 378 F.3d at 544).

Under the Social Security regulations, "a written report by a licensed physician who has examined the claimant and who sets forth in his report his medical findings in his area of competence . . . may constitute substantial evidence . . . adverse to the claimant" in a disability proceeding. *Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 713 (6th Cir. 2013) (quoting *Richardson*, 402 U.S. at 402).

### a. Mental health evidence of record

*i. Dr. Sieben's treatment records*

Plaintiff's primary care physician, Dr. Candice Sieben, M.D., treated plaintiff for several years for a depressive disorder and generalized anxiety disorder for which she prescribed psychotropic medications. On October 25, 2012, plaintiff presented to Dr. Sieben with

depressive symptoms of mood swings, irritability, crying spells, lack of motivation, insomnia, loss of appetite, fatigue, difficulty concentrating, hopelessness, and suicidal thoughts without plan. (Tr. 312-17). Dr. Sieben reported that plaintiff had been on a trial dose of Citalopram 20 mg with uncertain results and had been taking Xanax for 10 years, which helped her anxiety and would be continued. (Tr. 313, 317). Dr. Sieben increased the Citalopram dosage to 40 mg daily. (Tr. 317).

On February 25, 2013, Dr. Sieben reported that plaintiff complained of anxiety with symptoms of palpitations, sweating, chest pain, shortness of breath, insomnia, racing thoughts, feelings of losing control, and difficulty concentrating. (Tr. 526-28). She prescribed Citalopram 40 mg and Xanax 1 mg every 8 hours. On May 25, 2013, plaintiff complained of anxiety with symptoms of palpitations, chest pain, shortness of breath, insomnia, feelings of losing control, and difficulty concentrating, and her medications were continued. (Tr. 521-24). Dr. Sieben reported on November 14, 2013 that plaintiff complained of worsening mental health symptoms and agoraphobia. (Tr. 788-94). Plaintiff reported she never wanted to leave her house and she avoided activities with her family and grandchildren. Dr. Sieben noted that plaintiff was anxious during the office visit, getting up several times and telling Dr. Sieben she wanted to leave the exam room and go home. Dr. Sieben reported plaintiff's mood was increasingly dysphoric and anxious. Plaintiff was continued on Citalopram and Xanax, the plan was to try Effexor, and she was given a referral for psychiatric care due to "severe symptoms with her current medication" and lack of success with several medications she had tried in the past. (Tr. 794).

On May 28, 2014, Dr. Sieben reported that plaintiff was very tearful in the exam room and her current medications were not working. (Tr. 776-82). Dr. Sieben advised plaintiff to follow up with a psychiatry office for worsening mood and anxiety. On October 9, 2014, Dr. Sieben reported that plaintiff complained of continuing anxiety symptoms which had their onset approximately 21 years earlier and had rapidly worsened since that time. (Tr. 761-65). Dr. Sieben reported that plaintiff did not have remission of her symptoms of anxiety and depression with her current medications (40 mg Citalopram and generic Xanax 1 mg); she was scheduled to see a psychiatrist and was seeing a counselor regularly, which had helped her symptoms; her past treatment included Paxil, Zoloft, Effexor, Wellbutrin, Celexa, Xanax and individual therapy, which had provided incomplete relief; and her mood was dysphoric, she was "nervous/anxious," and she was "tearful at times." (Tr. 761, 764).

*ii. Community Behavioral Health, Inc. treatment records*

Plaintiff sought mental health treatment at Community Behavioral Health in August 2014 on a referral from Dr. Sieben. (Tr. 735). Plaintiff was treated by Dr. Baula, a psychiatrist, and Ms. Whitecar, a mental health therapist. At her initial evaluation in August 2014, plaintiff reported that she had been suffering with depression since she was a child and had seen two different male therapists, but she just felt worse. (*Id.*). Plaintiff reported that: "I sleep a lot, I can't do anything," she lacked energy and motivation, and "my house is filthy, I'm so tired, my life's over." (*Id.*). Plaintiff also reported, "I can't make myself go to the store, I get panic attacks; I take Xanax and generic of Celexa ([prescribed by Dr. Sieben]). There's so much going through my head, I forget things, I can't concentrate." (*Id.*). She reported having panic attacks on a daily basis and drinking 3-6 beers 2-3 times a week, but she reported she had cut back from

9

drinking alcohol daily. (Tr. 735, 738, 740). Plaintiff was diagnosed with major depressive disorder, recurrent, severe; posttraumatic stress disorder (PTSD); cannabis abuse; and alcohol abuse. (Tr. 742). Plaintiff's mental functioning was assessed on the Global Assessment of Functioning (GAF) scale.[2] Plaintiff was assigned a GAF score of 35.[3] (*Id.*). The recommendation was for counseling and a psychiatric and alcohol/drug assessment. (Tr. 743).

Ms. Whitecar's treatment notes reflect that when she saw plaintiff on September 2, 2014, her mood/affect was "tearful/anxious," her thought process/orientation was "slow," and she was "anxious for help with worsening depression," which she felt was "taking over her life." (Tr. 725). On September 12, 2014, plaintiff's mood was "dysthymic/congruent," plaintiff reportedly struggled to get out of the house and complete activities of daily living, and she felt frustrated with herself. (Tr. 723). On September 26, 2014, plaintiff's mood/affect was dysthymic/congruent, her thought process/orientation was preoccupied and logical, and her behavior was cooperative, but her depression had worsened. (Tr. 721).

On October 1, 2014, plaintiff continued to struggle with dependency and anxiety symptoms; she had no income and she lacked the motivation to fill in or mail her Social Security disability paperwork; she reportedly had no food in the house because she was too nervous to

---

[2] The GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* (DSM) 32 (4th ed., text rev. 2000). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death)." *Id.* at 34. Although found in earlier editions of the DSM, an update of the DSM eliminated the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice." *Leach v. Comm'r of Soc. Sec.*, No. 3:13-cv-2037, 2015 WL 1221925, at *3 (N.D. Ohio Mar. 17, 2015) (citing *Diagnostic and Statistical Manual of Mental Disorders* at 16) (5th ed., 2013).

[3] Individuals with scores of 31-40 demonstrate "[s]ome impairment in reality testing, or impairment in speech and communication, or serious impairment in several of the following: occupational or school functioning, interpersonal relationships, judgment, thinking, or mood." DSM at 32.

10

drive herself places; she was neglecting her physical health; and she needed help completing her activities of daily living and with transportation, obtaining a stable income and social support. (Tr. 718). On mental status examination, she was reported to be disheveled, frail, and underweight. (Tr. 718-19). There was no change in her diagnosis but it was noted that plaintiff "would benefit from a higher level of case management" and there was a "substantial need" for case management services. (*Id.*). On October 3, 2014, plaintiff's appearance was casual and neat; her thought process was clear, coherent, and tangential; her affect was appropriate, guilty, and constricted; and her mood was apprehensive. (Tr. 716-17). Plaintiff had suicidal ideation and she had been drinking 6-8 beers a day. (Tr. 717-18). She was making fair progress but scores indicated a severe level of depression and anxiety. (*Id.*). In a phone counseling session on October 8, 2014, plaintiff reported that she "got lost when returning home from Atrium" the prior day, an experience she described as "traumatic." (Tr. 716). The notes reflect that plaintiff seemed to get lost and disoriented easily, she disliked leaving home, and she relied on her daughter to help her with purchases. Ms. Whitecar's treatment notes from a phone counseling session conducted on October 17, 2014, reflect that plaintiff had made fair progress toward her goals; however, she was not completing her activities of daily living and feared making phone calls to community resources, and she had left home once to drive to the mailbox. (Tr. 714-15).

At her initial visit with Dr. Baula on October 22, 2014, plaintiff was prescribed Trazadone for sleep and given samples of Brintellix, an anti-depressant, in addition to her current medications, which included Xanax. (Tr. 712-713). Plaintiff was cooperative and in tears, her thought process was coherent, linear, logical and goal-directed, and her mood/affect was depressed, dysphoric and constricted. Plaintiff reported she had poor concentration, a depressed

11

mood, and severe anxiety with panic attacks. She complained she was not doing the things she used to enjoy and had been isolating herself. She endorsed symptoms of PTSD, including "hypervigilance, increased startle, flashbacks, avoidance of reminders [and] difficulty sleeping." (Tr. 713). Plaintiff reported she cannot stand to be around large crowds.

Ms. Whitecar reported after a November 25, 2014 phone counseling session that plaintiff seemed to have made limited progress toward her goals in that session. (Tr. 948-49). Plaintiff reported she was too panicked to go out and so upset; her depression was so much worse; she did not know the last time she had been out and she had not seen her grandsons; her daughter had been helping her buy groceries; she continued to struggle to get out of her house, complete activities of daily living, and complete paperwork; and she was drinking more and knew she needed to stop. The treatment notes for plaintiff's next phone counseling session on December 17, 2014 reflect that plaintiff was making fair progress, she was having daily panic attacks, she could not make herself get out of the house, she was leaving her blinds and doors closed and locked most of the time and was isolating herself, she had missed important doctor appointments, and her daughter and ex-husband ran errands for her. (Tr. 946-47).

Dr. Baula completed a Mental Impairment Questionnaire on December 18, 2014. (Tr. 754-59). Dr. Baula reported that he had seen plaintiff once prior to completing his questionnaire. (Tr. 754). He diagnosed plaintiff with recurrent depression-severe, PTSD, alcohol abuse, and rule out agoraphobia. (*Id.*). Dr. Baula assigned plaintiff a GAF score of 35. (*Id.*). Dr. Baula reported that plaintiff had been treated with medication, psychotherapy and case management and had shown a generally favorable response, but he noted she "cannot come in often." (*Id.*). He had prescribed Trazadone, which caused drowsiness. (*Id.*). The clinical findings on which

he based his assessment of the severity of plaintiff's mental impairments and symptoms were "small frame, unkempt, thin, frail, avoidant eye contact, rapid/pressured speech. Anxious mood [with] congruent affect. Very agitated, vigilant." (*Id.*). Dr. Baula described plaintiff's prognosis as "fair" but noted she limited herself to phone psychotherapy and had to force herself to come to her appointments. (*Id.*). Dr. Baula opined that plaintiff was unable to meet competitive standards or had no useful ability to function in nearly all areas of mental functioning required to perform work; however, he opined that she was seriously limited but not precluded from understanding, remembering and carrying out very short and simple instructions and maintaining socially appropriate behavior. (Tr. 756-57). As support for his findings, Dr. Baula reported that plaintiff often forgets questions when they are asked; she is easily disoriented and overwhelmed by stressors and triggers such as strangers, large groups of people and noise; she is easily overwhelmed due to poor concentration, memory and focus; she has frequent panic attacks; she is very agitated and anxious; she fails to complete activities of daily living; she becomes lost when driving even in a familiar area; and she is extremely nervous and hypervigilant in public. (*Id.*). Dr. Baula determined that plaintiff had marked restriction of activities of daily living, extreme difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence or pace, and she had experienced four or more episodes of decompensation within a 12 month period of at least two weeks duration. (Tr. 757). Dr. Baula also indicated that plaintiff had a medically documented history of a chronic organic mental, schizophrenic, etc. or affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with symptoms or signs currently attenuated by medical or psychosocial support, and an anxiety related disorder and complete

inability to function independently outside the area of her home. (Tr. 758). He reported that she "indicates symptoms predate her involvement with" his agency. (Id.). Dr. Baula opined that plaintiff's impairments and treatment would cause her to miss more than four days of work each month.

Ms. Whitecar completed a Mental Impairment Questionnaire on December 15, 2014. (Tr. 748-53). Ms. Whitecar reported that her initial contact with plaintiff was on August 7, 2014, and they had biweekly contact at plaintiff's request, typically by telephone. (Tr. 748). Like Dr. Baula, Ms. Whitecar assigned a GAF score of 35. (Id.). She reported the clinical findings that supported her conclusions as: "Appearance - unkempt, thin, avoidant eye contact, rapid [and] pressured speech. Very anxious mood, psychomotor agitation, forgot questions after they were asked. She is typically very agitated that she had to leave home." (Id.). Ms. Whitecar opined that plaintiff's prognosis was "fair" and that she needed long-term psychotherapy and medical treatment. (Id.). Her findings as to plaintiff's mental abilities and aptitudes needed to perform work and meet competitive standards were consistent in all respects with Dr. Baula's findings. (Tr. 750-51). As support for her findings, she reported that plaintiff often forgets or is unable to complete activities of daily living; she often becomes "overwhelmed, panicked and disoriented"; she is easily overwhelmed due to concentration, memory and focus issues; she struggles to maintain calm when anxious and has frequent panic attacks; she has become lost and disoriented when driving to familiar places; she is extremely nervous when interacting with people outside her immediate family; and she has difficulty coming to the office for sessions. (Tr. 750-51). She opined that plaintiff had marked restriction in activities of daily living, extreme difficulties maintaining social functioning, and marked difficulties maintaining concentration, persistence or

pace, and that she had experienced four or more episodes of decompensation of at least two weeks duration. (Tr. 751). Ms. Whitecar further opined that plaintiff had an anxiety related disorder and complete inability to function independently outside the area of her home, stating that she relies on "agency and family members to go shopping for food etc.," and although she could improve, she would need "significant time to focus on therapy." (Tr. 752). She estimated that plaintiff's impairments and treatment would cause her to miss more than four days of work each month. (Tr. 753).

On December 30, 2014, Dr. Baula reported that plaintiff continued to have PTSD symptoms and was isolating herself. (Tr. 944-45). He noted she was anxious even around her children and her grandchildren. The Brintellix had not helped much. He adjusted her medications by decreasing the Brintellix, starting her on Zoloft 50 mg, increasing the Xanax to 1 mg four times daily, and continuing the Trazadone.

On January 23, 2015, plaintiff had a phone session with Ms. Whitecar, who reported that plaintiff was making little progress. (Tr. 938-39). Plaintiff reported that she continued to drink 6-8 beers per day, she had not left her home, and she barely opened the windows. She reported that she had missed a few medical appointments and refused her daughter's offer to clean her home. Plaintiff was assigned to work with Jeanne Hobbs for ongoing case management services on January 26, 2015. (Tr. 938).

On March 24, 2015, Dr. Baula reported that he would give plaintiff Xanax only on the condition that she quit drinking, which she agreed to do. (Tr. 929). Dr. Baula prescribed Naltrexone 50 mg daily to treat opioid/alcohol abuse, increased Zoloft to 100 mg daily, and continued Xanax 1 mg four times daily and Trazadone 50 mg. There were no significant mental

15

status examination changes from plaintiff's last visit. Plaintiff reported to Dr. Baula on April 24, 2015, that she was sober but her PTSD symptoms had worsened since she stopped drinking. (Tr. 923). She noted the medication helped and she was waiting on a new therapist. Her medications were continued and no changes were noted on mental status examination. On June 23, 2015, Dr. Baula increased the Xanax to 2 mg three times daily and Zoloft to 150 mg daily, and he continued Trazadone and Naltrexone. (Tr. 913). Dr. Baula reported on August 19, 2015 that plaintiff continued to have PTSD symptoms but the extra Xanax was helping with her anxiety. (Tr. 1028-31). He increased the Zoloft dose and continued her other medications.

On June 9, 2015, plaintiff spoke by phone with case manager Ms. Hobbs, who reviewed plaintiff's need for case management services. (Tr. 916-18). They discussed plaintiff's agoraphobia, her difficulty keeping appointments, her need for assistance in getting food supplies and other items, and her need for help cleaning her home. Ms. Hobbs noted that plaintiff lives alone and does not leave her home often. Ms. Hobbs reported that plaintiff had not made any progress. Ms. Hobbs assisted plaintiff in obtaining groceries on July 1, 2015 due to plaintiff's agoraphobia and high level of anxiety. (Tr. 1040-43). Ms. Hobbs noted that plaintiff's home was very neat and tidy and she was appropriately dressed. Ms. Hobbs also noted that plaintiff had her grocery list very well written and had all the items in order of the aisles so as to expedite shopping. (Tr. 1041). Ms. Hobbs assisted plaintiff with her grocery shopping on August 3, 2015, and reported that plaintiff was "very paranoid and agoraphobic and it is a struggle for [her] to shop." (Tr. 1038). Ms. Hobbs reported that plaintiff does not drive, she has "high anxiety," and she "tends to appear OCD (obsessive compulsive disorder)." (*Id.*). Ms. Hobbs spoke with plaintiff by telephone on August 17, 2015, and reported that plaintiff lives in a very cluttered

trailer, she is agoraphobic and stays inside most of the time, she is usually very anxious and nervous, and she does not leave home and therefore must depend on others. (Tr. 1035). Ms. Hobbs assisted plaintiff with obtaining her medications after her appointment with Dr. Baula on August 19, 2015, and reported that plaintiff was "highly agoraphobic and does not like to be out in public"; her trailer was "tidy yet very cluttered" as plaintiff stayed inside most of the day; and she does not have many friends and never goes anywhere. (Tr. 1019). On September 1, 2015, Ms. Hobbs assisted plaintiff with getting groceries. (Tr. 1015). She reported that plaintiff is agoraphobic and she has panic attacks, which limits her ability to get out. Ms. Hobbs noted that plaintiff is "very organized and tidy" because she "is OCD." (*Id.*). Ms. Hobbs reported that plaintiff had made no progress in her treatment.

### iii. *Consultative examining psychologist's report*

Before plaintiff began treatment at Community Behavioral Health, Dr. Lief Noll, Ph.D., performed a consultative evaluation of plaintiff on behalf of the state agency on May 22, 2013. (Tr. 510-15). Plaintiff reported that she had been depressed for years, even in childhood, and that she was still struggling following the death of her mother 21 years before the evaluation. (Tr. 511). Dr. Noll reported that plaintiff became tearful in the interview and could not stop crying when talking about this. Plaintiff reported she had panic attacks a few times a week during which she shakes, her mind goes blank, she hyperventilates, and her heart beats fast. (Tr. 513). Plaintiff reported that she had a social phobia and she felt quite nervous and panicky when out in places such as malls and big stores, which she avoided. She said she had a driver's license but was afraid to drive and did so rarely because she got easily distracted.

On mental status examination, Dr. Noll noted that plaintiff was well groomed and her eye contact was good. She was "somewhat fidgety." (*Id.*). She became sad and tearful at times during the interview. She did not appear to be "overly anxious." (*Id.*). Dr. Noll found plaintiff's memory was "good and intact" and her concentration seemed normal and appropriate for the interview. (*Id.*). She was cooperative, and her insight was fair. (Tr. 514). Dr. Noll reported that plaintiff whispered through the interview because of her dysphagia.[4] (Tr. 513). Dr. Noll diagnosed major depression, moderate, recurrent; anxiety disorder, not otherwise specified; nicotine dependence; and a social phobia. Dr. Noll assigned plaintiff a GAF score of 60.[5] (Tr. 514). He opined that plaintiff's persistent smoking in the face of emphysema and dysphagia seemed self-destructive. He also believed that her social isolation and severe poverty were not helping her mental health condition. He stated that she had never "really been in therapy" and opined that she could possibly learn skills to manage her anxiety and depression more effectively with counseling. (*Id.*). Dr. Noll reported that her physical symptoms appeared to be quite debilitating and her difficulty with speech due to her dysphagia would be a significant barrier in any workplace.

Dr. Noll assessed plaintiff's mental functional abilities as follows: With respect to plaintiff's abilities and limitations in understanding, remembering and carrying out instructions, Dr. Noll reported that she was not observed in a setting where she was asked to carry out

[4]Dysphagia is "difficulty in swallowing" and "can range from mild discomfort, such as a feeling that there is a lump in the throat, to a severe inability to control the muscles needed for chewing and swallowing." https://medical-dictionary.thefreedictionary.com/dysphagia (last accessed November 14, 2017).

[5] An individual with a GAF score of 51-60 is classified as having "moderate symptoms . . . or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

instructions but she seemed to have struggled at work, possibly due in part to cognitive limitations. Dr. Noll opined that if plaintiff is depressed, which he believed her to be, that would "also significantly impact attention, concentration, and work performance." (Tr. 515). Dr. Noll noted that plaintiff was not observed performing multi-step tasks but she appeared to have adequate attention and concentration to complete the interview, although she was "clearly taxed" by maintaining a conversation for 45 minutes. (*Id.*). Dr. Noll also noted that while plaintiff's abilities and limitations in responding appropriately to supervision and coworkers in a work setting could not be directly observed at the interview, she "reported no behavioral problems or problems with supervisors at work beyond her difficulty concentrating and her tendency to be forgetful and make mistakes at work." (*Id.*). Finally, as to plaintiff's ability to respond appropriately to work pressures in a work setting, Dr. Noll noted that plaintiff reported she was prone to making mistakes and having difficulty concentrating at work.

*iv. Non-examining State Consultative Physicians*

Non-examining state agency psychologist Todd Finnerty, Psy.D., reviewed the record on June 24, 2013, and determined that plaintiff had mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace; with no episodes of decompensation of extended duration. (Tr. 81). Dr. Finnerty found plaintiff partially credible, noting she can perform personal care and some household chores and her relationship with her family is "ok." (Tr. 82). Dr. Finnerty concluded that plaintiff can sustain a static set of tasks without fast pace; she is limited to superficial contact with others; and she can adapt to a static setting without frequent changes. (Tr. 85-86). Karen Steiger, Ph.D., a state agency psychologist, reviewed the record for

reconsideration purposes on October 9, 2013 and affirmed Dr. Finnerty's assessment. (Tr. 112-17).

### b. ALJ's weighing of the psychological opinion evidence

The ALJ gave "significant weight" to Dr. Noll's assessment that plaintiff was "not more than moderately impaired" and to the similar assessments of the state agency reviewing psychologists. (Tr. 24). The ALJ noted that Dr. Noll had assessed plaintiff as having "adequate attention and concentration to complete the interview," Dr. Noll found that she did not exhibit any problems relating at the interview, and plaintiff did not report behavioral problems at work or issues with supervisors to Dr. Noll or anywhere else in the record, other than difficulty concentrating and her tendency to be forgetful and make mistakes at work. (*Id.*, citing Tr. 90-103, 121-135, 510-516). However, the ALJ found that plaintiff was moderately impaired in social functioning rather than mildly impaired as found by the state agency reviewing psychologists (*see* Tr. 95, 127) and restricted her to superficial interaction with others to account for her complaints in this area of functioning. (Tr. 24).

The ALJ gave "less weight and not controlling weight" to Dr. Baula's December 2014 assessment. (Tr. 24, citing Tr. 754-59). The ALJ discounted Dr. Baula's opinion on the grounds he had seen plaintiff only once before issuing his assessment; the GAF score of 35 he assigned was not supported by his treatment records; and the GAF score was not supported by other treatment records, including the March 2015 treatment records of plaintiff's primary care physician, Dr. Sieben, and the July 2015 treatment records of Dr. Brian Cusick, M.D., plaintiff's ENT. (*Id.*, citing Tr. 988, 1002).

Plaintiff alleges that the ALJ erred by declining to afford controlling weight to Dr. Baula's opinion, which she claims supports a finding that she meets Listing 12.04 and 12.06 of the Listing of Impairments, and the ALJ did not give "good reasons" for giving the opinion discounted weight. (Doc. 12 at 11-12). Plaintiff contends that the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. Plaintiff acknowledges that Dr. Baula completed his assessment after seeing her only once; however, plaintiff alleges that the two specific records from treating physicians that the ALJ cited when discounting Dr. Baula's opinion are not sufficient to reject a treating mental health provider's opinion in light of the numerous mental health treatment notes documenting plaintiff's mental impairments. (Doc. 12 at 11, citing Tr. 711-747, 910-949, 1015-1043). In addition, plaintiff alleges that Dr. Sieben's March 3, 2015 treatment notes include findings that her affect was anxious and her mood was flat and dysphoric, which support Dr. Baula's opinion.

The ALJ's decision to give Dr. Baula's opinion less than controlling weight is not substantially supported by the record. Further, the ALJ did not give good reasons that are supported by substantial evidence for giving Dr. Baula's opinion reduced weight. Initially, the Commissioner correctly notes that there is a legitimate question as to whether Dr. Baula was a treating source for purposes of the regulations as of the date he assessed plaintiff's mental health in December 2014 since he had seen plaintiff only once at that point. (Doc. 18 at 6; *see Helm v. Comm'r of Social Sec.*, 405 F. App'x 997, 1001 n.3 (6th Cir. 2011) ("[I]t is questionable whether a physician who examines a patient only three times over a four-month period is a treating source-as opposed to a nontreating (but examining) source") (citing *Smith v. Comm'r of Social*

21

*Sec.*, 482 F.3d 873, 875 (6th Cir. 2007) (quoting former 20 C.F.R. § 404.1502[6]) ("A 'nontreating source' (but examining source) has examined the claimant 'but does not have, or did not have, an ongoing treatment relationship with' her"); *Yamin v. Comm'r of Social Sec.*, 67 F. App'x 883, 885 (6th Cir. 2003) (doctor who examined claimant on only two occasions did not have a long term overview of claimant's condition). Nonetheless, because plaintiff had been a patient at Community Behavioral Health for several months before Dr. Baula saw her and the ALJ apparently evaluated Dr. Baula's opinion under the treating source rule, the Court should apply the treating source rule to the ALJ's analysis of Dr. Baula's assessment.

The ALJ found that Dr. Baula's opinion was not entitled to controlling weight because it was not supported by either his records or the treatment records of other providers. The ALJ found that at the time he issued his assessment, Dr. Baula had seen plaintiff only once and the GAF score of 35 he assessed appeared to be based on plaintiff's self-reported symptoms. (Tr. 22-23). The ALJ found that although a score of 35 indicates "very serious symptomatology," the only treatment Dr. Baula prescribed in October 2014 was Trazadone 50 mg for sleep and the record gave no indication plaintiff ever required emergency care or that mental hospitalization was recommended. (Tr. 23).

The evidence cited by the ALJ does not substantially support her finding that Dr. Baula's assessment is unsupported by his own treatment records. A GAF score of 35 denotes "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work)." DSM at 34.

---

[6] Section 404.1502 was modified effective March 27, 2017, and the definition of nontreating source was omitted from the amended regulation. The prior version quoted in *Smith* was in effect from June 13, 2011 until the effective date of the amendment and therefore applies here.

The ALJ did not explain why Dr. Baula's treatment records are inconsistent with his assessment of major impairment in these areas. Nor is it clear from the record that Dr. Baula's assessment is inconsistent with his treatment records. Although the ALJ appears to have limited her consideration of the treatment records to reports generated by Dr. Baula documenting his contacts with plaintiff, Dr. Baula's treatment records include the therapy records of Community Behavioral Health where Dr. Baula practiced and plaintiff was treated, and Dr. Baula specifically noted plaintiff was receiving psychotherapy when he assessed plaintiff's functional capacity. (Tr. 754). Contrary to the ALJ's finding, those treatment records provide ample support for Dr. Baula's assessment of major impairment in several areas of mental functioning.

According to the Community Behavioral Health records, plaintiff's treatment plan called for counseling services and medication therapy with a psychiatrist. The treatment records document debilitating mental health symptoms for which plaintiff received an expanding level of mental health services, with little to no improvement in her condition. When initially seen at Community Behavioral Health on referral by Dr. Sieben on August 7, 2014, plaintiff reported she was having panic attacks on a daily basis, she lacked the energy and motivation to do anything, and she was forgetful and unable to concentrate. (Tr. 735-744). Treatment notes from nine subsequent in-person visits and phone counseling sessions with Ms. Whitecar between September and December 2014 reflect plaintiff's continued symptoms of severe depression, anxiety, and inability to complete activities of daily living. (Tr. 725-33, 723-24, 721-22, 718-19, 716-18, 715-716, 714-15, 948-49, 946-47). Findings on mental status examination in September 2014 included "tearful/anxious" and "dysthymic/congruent" mood/affect and "slow" thought process/orientation. (Tr. 721, 723, 725). In early October, plaintiff's appearance was

disheveled, frail and underweight. (Tr. 718-19). Plaintiff reported she lacked the motivation to fill in or mail her disability paperwork even though she had no income. (Tr. 718). Ms. Whitecar opined that plaintiff would benefit from a higher level of case management. (Tr. 718-19). During another visit two days later, plaintiff's affect was guilty and constricted, her mood was apprehensive, and she had suicidal ideation. (Tr. 717). Scores indicated a severe level of depression and anxiety. (Tr. 718). In her subsequent phone counseling session with plaintiff on November 25, 2014, Ms. Whitecar reported that plaintiff had made limited progress toward her goals in that session. (Tr. 948-49). Plaintiff reported worsening symptoms, advising Ms. Whitecar that she was too panicked to go out and was "so upset," her depression was getting "so much worse," she did not know the last time she had been out and she had not seen her grandsons, her daughter helped her with groceries, and she continued to struggle to get out of her house, complete paperwork, and complete activities of daily living. Plaintiff also reported that she was drinking more and knew she needed to stop. The treatment notes for plaintiff's next phone counseling session on December 17, 2014 reflect that plaintiff was making fair progress, she was having daily panic attacks, she could not make herself get out of the house, she was leaving her blinds and doors closed and locked most of the time and was isolating herself, she had missed important doctor appointments, and her daughter and ex-husband ran errands for her. (Tr. 946-47). Simple goals were set for plaintiff of trying to open the blinds once a day for increasing time periods and trying to cook something for herself.

When Dr. Baula first saw plaintiff on October 22, 2014, plaintiff was in tears and her mood/affect was depressed, dysphoric and constricted. (Tr. 712-13). She reported the same symptoms which are reflected in Ms. Whitecar's therapy notes: poor concentration, depressed

24

mood, severe anxiety with panic attacks, and self-isolation. Plaintiff reported that she cannot stand to be around large crowds and she endorsed symptoms of PTSD. (Tr. 713). Dr. Baula increased plaintiff's medications by giving her samples of Brintellix, an anti-depressant, and ordering Trazadone for sleep, and he noted she still had refills of Xanax prescribed by Dr. Sieben. (*Id.*).

Contrary to the ALJ's finding, the treatment records generated prior to Dr. Baula's December 2014 assessment thus document serious and debilitating symptoms in several areas of mental functioning and appear to support the treating psychiatrist's assessment. The ALJ nonetheless found the records were inconsistent with Dr. Baula's assessment because (1) the GAF score of 35 appeared to be based on plaintiff's self-report, and (2) Dr. Baula prescribed only Trazadone 50 mg in October 2014 for sleep and there was no indication of the need for emergency care or a recommendation for mental hospitalization. (Tr. 22-23). Neither of these reasons is substantially supported by the record. Plaintiff was treated at Community Behavioral Health on a regular basis over a sustained period of time by Dr. Baula and mental health therapists. The objective mental status examination findings set forth above corroborate Dr. Baula's diagnoses of severe mental impairments and accompanying symptoms. Further, although Dr. Baula's assessment was necessarily based to some extent on plaintiff's subjective report of symptoms, this was not a valid reason for the ALJ to discount the treating psychiatrist's opinion in this case. The case law recognizes the difficulty of ascertaining and verifying mental disorders by the same objective techniques applicable to most physical illnesses and holds: "[W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology. The

25

report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to question the diagnostic techniques." *Keeton v. Comm'r of Soc. Sec.,* 583 F. App'x 515, 526-27 (6th Cir. 2014) (citing *Blankenship v. Bowen,* 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen,* 817 F.2d 865, 873-74 (D.C. Cir. 1987)). Dr. Baula's diagnoses and assessment of plaintiff's mental functioning are amply documented in the treatment records, and the fact that Dr. Baula relied on plaintiff's subjective reports to some extent in assessing her functioning is therefore not a valid basis for rejecting his assessment.

Second, the ALJ's finding that Dr. Baula prescribed only Trazadone 50 mg for sleep at plaintiff's initial office visit in October 2014 is misleading. (Tr. 23). The ALJ neglects to mention that plaintiff was also taking psychotropic medications which had been prescribed by her primary care physician, Dr. Sieben. Plaintiff was taking Xanax, which Dr. Baula continued, as well as Citalopram. (Tr. 713, 763). The ALJ also fails to note that Dr. Baula gave plaintiff samples of the prescription anti-depressant Brintillex at her initial appointment. (Tr. 713). Thus, plaintiff was receiving much more extensive medical treatment for her mental impairments at the time of Dr. Baula's assessment than the ALJ acknowledged. The ALJ did not properly decline to give Dr. Baula's opinion controlling weight on the ground the medications he prescribed did not support his assessment of the severity of plaintiff's mental impairments and symptoms.

Further, the mental health treatment records do not show any improvement in plaintiff's condition following Dr. Baula's December 2014 assessment. Plaintiff continued to report symptoms of social isolation due to agoraphobia, a high level of anxiety, panic attacks, severe depression, PTSD, and difficulty performing even the most basic activities of daily living and the

need for help doing so, both in her own home and out in public. (Tr. 944-45, 938-39). Dr. Baula and the other providers at Community Behavioral Health documented debilitating mental health symptoms which required an increasing level of medication and services, even as late as September 2015. (Tr. 1015). Dr. Baula started plaintiff on Naltrexone and Zoloft and increased her doses of Xanax and Zoloft at her five appointments with him between December 30, 2014 and August 19, 2015. (Tr. 944-45, 929, 1028-31). Plaintiff's case management services were also increased to include assistance with grocery shopping, cleaning her home, keeping appointments, and accessing community resources. (Tr. 916). Plaintiff's case manager, Ms. Hobbs, reported in June 2015 that plaintiff was "very paranoid and agoraphobic and it is a struggle for [her] to shop," she does not drive, she has "high anxiety," and she "tends to appear OCD." (Tr. 1038). In August 2015, plaintiff articulated her treatment goals as "[t]o get back to normal and leave the house [and] go to the store and face people so I am not by myself anymore." (Tr. 1025). These mental health treatment records document serious and debilitating symptoms in several areas of mental functioning continuing well past the date of Dr. Baula's assessment.

Further, the evidence does not substantially support the ALJ's finding that Dr. Baula's assessment was not consistent with the other evidence of record, including treatment notes generated by Dr. Sieben on March 3, 2015 and by Dr. Cusick on July 21, 2015. (Tr. 24). The ALJ relied on portions of the report of Dr. Cusick, plaintiff's ear, nose and throat specialist, finding that plaintiff was oriented to person, place and time and that she "is active." (Tr. 1002). It is not clear how Dr. Cusick's finding that plaintiff was oriented is inconsistent with any

psychiatric finding or assessment made by Dr. Baula. Further, Dr. Cusick's unexplained and vague comment that plaintiff "is active" sheds little to no light on plaintiff's mental status.

Nor does Dr. Sieben's report, read as a whole, appear to be inconsistent with Dr. Baula's assessment. In finding otherwise, the ALJ "cherry-picked" select portions of the medical record to discredit Dr. Baula's opinions instead of performing a proper analysis of the medical evidence under agency regulations and controlling case law. *See Germany-Johnson v. Comm'r of Social Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (noting the ALJ "was selective in parsing the various medical reports"); *Boulis-Gasche v. Comm'r of Soc. Sec.*, 451 F. App'x 488, 494 (6th Cir. 2011) (noting ALJ's conclusion was "grounded in a myopic reading of the record combined with a flawed view of mental illness"). The ALJ relied on isolated findings from Dr. Sieben's March 2015 report to find that Dr. Baula's assessment was inconsistent with the treatment notes of plaintiff's primary care physician. The ALJ noted that Dr. Sieben reported that plaintiff did not have suicidal thought content or homicidal ideation, her judgment and insight were fair, and her behavior was normal. (Tr. 24, citing Tr. 988). The ALJ did not acknowledge the abnormal mental status examination findings that Dr. Sieben reported on the same date. Dr. Sieben noted that plaintiff's affect was anxious, her mood was flat and dysphoric, and her thought processes were circumstantial. (*Id.*). The ALJ also ignored clear indications in Dr. Sieben's notes from that date that plaintiff's mental health had deteriorated. Dr. Sieben reported that plaintiff "has a long history of anxiety and depression," for which she had taken Xanax for many years, she was currently being prescribed Sertraline, and plaintiff had stopped taking Citalopram because she did not think it was helping much; "[h]owever, now her anxiety is so severe that she finds it very difficult to leave her house. In fact, she tells me she is uncomfortable staying here in the office

and she cannot wait to get out and get home." (Tr. 986). The ALJ also ignored Dr. Sieben's treatment notes from plaintiff's October 9, 2014 office visit, which preceded Dr. Baula's initial visit with plaintiff by less than two weeks. (Tr. 760-63). Dr. Sieben reported that plaintiff complained of rapidly worsening anxiety symptoms, including palpitations, sweating, chest pain, shortness of breath, dizziness, insomnia, racing thoughts, feelings of losing control, and difficulty concentrating. (Tr. 761). These findings appear to be consistent with Dr. Baula's assessment of serious mental health symptoms.

The ALJ also failed to acknowledge findings by consultative examining psychologist Dr. Noll that appear to support Dr. Baula's findings of debilitating mental symptoms. For instance, Dr. Noll reported that plaintiff became tearful in the interview and could not stop crying when talking about her mother's death. (Tr. 511). Although Dr. Noll opined that plaintiff was no more than moderately impaired, he also opined that "if" plaintiff was depressed, which he believed her to be, this would "significantly impact" her attention, concentration, and work performance. (Tr. 515). Dr. Noll also qualified his findings by noting that plaintiff was not observed performing multi-step tasks but she was "clearly taxed" by maintaining a conversation for 45 minutes during the interview. (*Id.*)

By selecting only the normal mental status examination findings from Dr. Sieben's March 2015 report to reject Dr. Baula's opinion and omitting any mention of the abnormal findings Dr. Sieben made in that and her other reports, the ALJ improperly "cherry picked" the record. Dr. Sieben's records, read as a whole and in conjunction with the remaining evidence of record, do not support the ALJ's finding that Dr. Baula's opinion was inconsistent with the other evidence of record.

The ALJ's decision declining to give Dr. Baula's opinion controlling weight is without substantial support in the record. The evidence does not substantially support the ALJ's finding that Dr. Baula's assessment of mental health symptoms and functional limitations is unsupported by his own treatment notes and the notes of the other providers of record.

In addition, the ALJ did not give "good reasons" for giving Dr. Baula's assessment "less weight" than the opinion of one-time examining psychologist Dr. Noll, taking into account the length of the treatment relationship, the frequency of examination, the supportability of the opinion, and the consistency of the opinion with other evidence in the record. 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ discounted Dr. Baula's opinion because he had seen plaintiff only one time. (Tr. 24). However, the ALJ did not appear to take this factor into account when evaluating the assessment of Dr. Noll, who likewise saw plaintiff only once before issuing his assessment. Nor did the ALJ appear to consider that Dr. Baula is a psychiatrist who medically managed plaintiff's condition over a sustained period of time and treated plaintiff in conjunction with a team of mental health professionals at Community Behavioral Health. While the ALJ noted earlier in her written decision that Dr. Baula had contact with plaintiff "only" five times over an approximately 8-month period between December 2014 and August 2015 and that his records "consist mainly of the claimant's medications and goals" (Tr. 23, citing Tr. 910-949, 1015-43), the ALJ did not explain what weight she gave these factors when evaluating Dr. Baula's opinion.

Moreover, the ALJ apparently gave no consideration to the other regulatory factors when assigning weight to Dr. Baula's opinion. The ALJ incorporated restrictions into the RFC finding based only on Dr. Noll's limited observations of plaintiff during his single examination and her

isolated self-reports without discussing whether Dr. Noll's opinion of no more than moderate impairment was supported by the other evidence of record. (Tr. 24). The ALJ also did not discuss whether Dr. Noll's assessment was supported by the other treatment records. The ALJ simply noted that Dr. Noll assessed plaintiff as having adequate attention and concentration to complete the interview, she did not display problems relating at the interview, and she reported no problems with supervisors other than a tendency to be forgetful and make mistakes at work. (*Id.*). The ALJ did not explain why these limited observations and findings supported a finding of only moderate impairment such that Dr. Noll's one-time evaluation was entitled to greater weight than the assessment of plaintiff's treating psychiatrist. (Tr. 24).

By subjecting the opinions of plaintiff's treating psychiatrist, Dr. Baula, to greater scrutiny than the opinion of the one-time examiner, Dr. Noll, the ALJ did not comply with the governing regulations. "A more rigorous scrutiny of the treating-source opinion than the nontreating . . . opinions is precisely the inverse of the analysis that the regulation[s] require." *Gayheart*, 710 F.3d at 379 (citing 20 C.F. R. § 404.1527(c), SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996)). The ALJ's "failure to apply the same level of scrutiny to the opinions of the consultative [psychologist] on which [s]he relied, let alone the greater scrutiny of such sources called for by 20 C.F.R. § 404.1527(c) [and § 416.927(c)], further demonstrates that [her] assessment of Dr. [Baula's] opinions failed to abide by the Commissioner's regulations and therefore calls into question the ALJ's analysis." *Id.* (citing *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)). The ALJ also failed to abide by the regulations by not giving "good reasons" for giving "less weight" to Dr. Baula's opinion. The ALJ did not weigh the regulatory factors and instead gave only vague and unsupported reasons for discounting Dr. Baula's opinion. (Tr.

24). The ALJ's reasons for discounting Dr. Baula's opinion are not substantially supported by the evidence of record. Plaintiff's first assignment of error should be upheld.[7]

## 2. Second assignment of error: Weight to Ms. Whitecar's opinion

Plaintiff alleges that the ALJ erred by failing to evaluate the opinion of Ms. Whitecar, her treating mental health therapist, in accordance with the regulatory factors. Because Ms. Whitecar is a licensed social worker, she is not an "acceptable medical source" as defined under the Social Security rules and regulations; instead, the therapist is categorized as an "other source." *See* SSR 06-03p, 2006 WL 2329939, *1-2 (2006)[8]; former 20 C.F.R. §§ 404.1513(a), 416.913(a).[9] Only "acceptable medical sources" as defined under former 20 C.F.R. §§ 1513(a), 416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *See* SSR 06-03p, 2006 WL 2329939, *2. Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how

---

[7] Plaintiff suggests that the ALJ erred by failing to adopt Dr. Baula's assessment that she meets the Listings. (Doc. 12 at 11). As the Commissioner notes, plaintiff has not factually or legally developed this argument. (Doc. 18 at 5, n.2). She has therefore waived it. *See Rice v. Comm'r of Soc. Sec.*, 169 F. App'x 452, 454 (6th Cir. 2006) (a plaintiff's failure to develop an argument in a Statement of Errors challenging an ALJ's non-disability determination amounts to a waiver of that argument). *See also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

[8] SSR 06-3p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-3p applies here.

[9] Former §§ 404.1513 and 416.913 were in effect until March 27, 2017, and therefore apply to plaintiff's claim filed in 2013. For claims filed on or after March 27, 2017, all medical sources, not just acceptable medical sources, can make evidence that the Social Security Administration categorizes and considers as medical opinions. 82 FR 15263-

it affects the individual's ability to function." *Id.* Factors that are appropriately considered in evaluating opinions from "other sources" who have seen the claimant in their professional capacities include "the nature and extent of the relationship between the source and the individual, the source's qualifications, the source's area of specialty or expertise, the degree to which the source presents relevant evidence to support his or her opinion, whether the opinion is consistent with other evidence, and any other factors that tend to support or refute the opinion." *Id.*, \*5. *See also Cruse v. Comm'r of Social Sec.*, 502 F.3d 532, 541 (6th Cir. 2007)). Not every factor will apply in every case. SSR 06-03p, 2006 WL 2329939, \*5.

The ALJ gave "little weight" to the opinion of Ms. Whitecar on the grounds she based her opinions on plaintiff's subjective reports, she communicated with plaintiff primarily over the telephone, and she is not an acceptable medical source under the Social Security rules and regulations. (Tr. 24). Plaintiff alleges the ALJ erred by failing to evaluate Ms. Whitecar's opinion under the factors set forth in the regulations and SSR 06-03p. (Doc. 12 at 12-14). Plaintiff argues the ALJ failed to consider how long Ms. Whitecar had known plaintiff; how consistent her opinion was with the other evidence of record, including evidence that corroborated difficulty plaintiff had leaving her home; and how well she explained her opinion. Plaintiff also argues that the ALJ erroneously discounted Ms. Whitecar's opinion on the ground it was based on plaintiff's self-reported symptoms. (*Id.* at 13, citing *Keeton*, 583 F. App'x at 526-27).

The ALJ's decision to discount Ms. Whitecar's opinion is not substantially supported. As plaintiff concedes, the ALJ correctly acknowledged that Ms. Whitecar is not an acceptable

medical source under the governing rules and regulations, and her opinion therefore is not entitled to controlling weight. (Tr. 24). The ALJ nonetheless failed to evaluate Ms. Whitecar's opinion in accordance with the applicable rules and regulations. The ALJ did not consider the extent and true nature of the treatment relationship, whether Ms. Whitecar presented relevant evidence to support her opinion, or whether the opinion was supported by the other evidence of record. Rather, the ALJ summarily rejected Ms. Whitecar's opinion because (1) it was "based on what the claimant reports" and (2) Ms. Whitecar communicated with plaintiff primarily by telephone. (*Id.*). The ALJ's characterization of Ms. Whitecar's treatment relationship with plaintiff is inaccurate. Ms. Whitecar had a total of nine phone and in-person contacts and sessions with plaintiff prior to the date of her assessment, only four of which were by phone and five of which were in person. (Tr. 714-19, 721-25, 946-49). The ALJ gave no consideration to the number of times Ms. Whitecar had seen plaintiff or had contact with her. The ALJ did not properly reject Ms. Whitecar's assessment on this ground.

Further, the ALJ's rejection of Ms. Whitecar's opinion because it was based in part on plaintiff's subjective complaints is not substantially supported. Ms. Whitecar's assessment was essentially identical to that of Dr. Baula, who was part of the same treatment group, and their assessments were issued just a few days apart. As discussed in connection with the first assignment of error, plaintiff's mental diagnoses and debilitating symptoms are consistently documented by objective findings in the extensive treatment records. The ALJ did not properly discount the treating mental health therapist's opinion on this basis. *See Keeton*, 583 F. App'x at 526-27 (citing *Blankenship,* 874 F.2d at 1121).

Finally, the ALJ failed to consider whether the other evidence of record supported Ms. Whitecar's assessment. The ALJ's failure to take this and the other relevant regulatory factors into account, coupled with the ALJ's improper reliance on other considerations to discount Ms. Whitecar's assessment, was error. Plaintiff's second assignment of error should be upheld.

### 3. Third assignment of error: The ALJ's non-severe impairment finding

Plaintiff alleges the ALJ erred at the second step of the sequential evaluation process by failing to determine that her "vocal cord dysfunction" was a severe impairment. (Doc. 12 at 14-16). Plaintiff alleges this impairment would have more than a minimal impact on her ability to work. Plaintiff alleges that even if the ALJ was correct in finding her vocal cord impairment was not a severe impairment, the ALJ erred by failing to include limitations imposed by the impairment when assessing her RFC. The Commissioner argues that the ALJ considered plaintiff's vocal cord impairment but "recognized additional treatment records" showing that plaintiff's hoarseness was "much improved" following post-operative speech therapy in October 2014. (Doc. 18 at 2-5, citing Tr. 53, 224). The Commissioner also points to other records to show that plaintiff's vocal cord condition improved with treatment. (*Id*. at 3-5). Finally, the Commissioner argues that the ALJ included communicative limitations in the RFC finding by limiting plaintiff to superficial contact with others, and plaintiff has not identified additional limitations her vocal cord impairment imposed on her ability to work. (*Id*. at 5).

The regulations define a severe impairment or combination of impairments as one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §§

404.1520(c), 416.920(c).[10] In the physical context, this means a significant limitation upon a plaintiff's ability to walk, stand, sit, lift, push, pull, reach, carry or handle. 20 C.F.R. §§ 404.1522, 416.922. Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions; the capacity for seeing, hearing and speaking; and the ability to use judgment, respond appropriately to supervisors, and deal with changes in a routine work setting. 20 C.F.R. §§ 404.1522(b), 416.922(b). Plaintiff is not required to establish total disability at this level of the sequential evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Sec'y of H.H.S.*, 736 F.2d 352, 357 (6th Cir. 1984). "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Watters v. Comm'r of Social Sec.*, 530 F. App'x 419, 421 (6th Cir. 2013) (citing *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). Although the standard is *de minimis*, the plaintiff bears the burden of demonstrating that she suffers from a medically determinable physical impairment and she must carry her burden by producing "medical signs and laboratory findings." *Id.* (quoting SSR 96-4p, 1996 WL 374187, at *1).

The ALJ found that plaintiff's vocal cord impairments were not severe because the evidence did not show they imposed more than a slight limitation on her ability to perform basic work activities. (Tr. 18). The ALJ noted that plaintiff underwent surgery for bilateral vocal cord masses in January 2013 and was diagnosed with benign laryngeal papillomatosis. (*Id.*, citing Tr. 328). Treatment records from Dr. Cusick dated October 2014 showed clear vocal cords with no

---

[10] The regulations defining a severe impairment were amended and renumbered effective March 27, 2017, but were

evidence of recurrent polyp disease, a normal trachea with no tracheal deviation, normal range of motion, normal phonation, and no mass. (*Id.*). Treatment records from October 2014 showed that plaintiff had recently completed postoperative speech therapy, her family felt her voice was much improved, and plaintiff had stopped smoking and was using only E cigarettes at that time. (*Id.*, citing Tr. 643-45).

Plaintiff alleges that the ALJ erred by failing to explain why she did not adopt voice limitations imposed by the state agency reviewing physicians, who assessed her as capable of performing light work with speaking restrictions. (Doc. 12 at 14-15, citing Tr. 24). Plaintiff alleges that substantial evidence shows she had difficulty speaking due to vocal cord dysfunction, including Dr. Noll's May 2013 report in which he noted that plaintiff whispered throughout the interview because of her dysphagia and opined that her difficulty with speech due to her dysphagia would be a significant barrier in any workplace (Tr. 513-14); Dr. Phillip Swedberg's May 2013 report that plaintiff had a soft voice which was occasionally hoarse and that she informed him it did not "hurt so much" if she whispered (Tr. 550); Dr. Sieben's July 2013 treatment note that "[p]er SLP eval[uation], her voice is also much improved although still very breathy" (Tr. 609); and an August 12, 2014 initial speech therapy evaluation following surgical bilateral vocal cord stripping performed by Dr. Cusick in June 2014 (Tr. 660-73) which assessed plaintiff with moderate dysphonia described as hoarse, strained, rough and breathy (Tr. 632). (Doc. 12 at 15-16). Plaintiff argues that this evidence shows her vocal cord impairments would have more than a minimal impact on her ability to work, and the ALJ therefore erred by failing to include limitations on voice communications in the RFC assessment.

not substantively modified.

Plaintiff has carried her burden to show that she suffered from a medically determinable vocal cord impairment during the period of alleged disability that would have more than a slight impact on her ability to work for an extended period of time. Plaintiff was diagnosed with bilateral vocal cord lesions in January 2013 and underwent vocal cord surgery for the second time approximately 18 months later in June 2014. (Tr. 888-92; Tr. 660-73). In the interim, state agency reviewing physicians assessed limitations on plaintiff's speaking ability and treating and examining physicians documented plaintiff's vocal cord impairment and resulting symptoms. State agency reviewing physician Dr. James Cacchillo, D.O., assessed plaintiff as limited to frequent speaking due to frequent hoarseness in June 2013. (Tr. 98-99). Dr. Cachillo cited Dr. Noll's May 2013 consultative examination report finding that plaintiff continued to smoke 1½ packs of cigarettes daily despite her respiratory complaints; her breath sounds were distant with no rales, rhonchi wheezes or evidence of cyanosis; she was not dyspneic during her examination; and she spoke in a soft voice but was easily understood. (Tr. 98). On reconsideration in November 2013, state agency reviewing physician Dr. Stephen Sutherland, M.D., opined that plaintiff needed a work environment where "[she] need only speak in soft voice to be clearly understood" and he recommended that she be limited to the need to communicate by voice on an occasional basis. (Tr. 115). The ALJ did not acknowledge these functional limitations assessed by the state agency physicians. The ALJ erred by not taking this relevant evidence into consideration and by failing to find that plaintiff's vocal cord impairment was a severe impairment.

An ALJ's failure to find a severe impairment where one exists may not constitute reversible error where the ALJ finds that the claimant "has at least one other severe impairment

and continues with the remaining steps of the disability evaluation." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 326 (6th Cir. 2015) (citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). "This rule is predicated on the notion that the ALJ 'properly could consider [the] claimant's [non-severe impairments] in determining whether [the] claimant retained sufficient residual functional capacity to allow [her] to perform substantial gainful activity.'" *Id.* (quoting *Maziarz*, 837 F.2d at 244). The harmless error analysis is appropriate in those instances where "the ALJ properly considered any functional limitations arising from non-severe impairments when crafting his residual functional capacity finding." *Dudley v. Comm'r of Soc. Sec.*, No. 2:16-cv-0682, 2017 WL 2374432, *4 (S.D. Ohio June 1, 2017) (Report and Recommendation) (Kemp, M.J.), *adopted,* 2017 WL 2645962 (S.D. Ohio June 20, 2017) (citation omitted).

Here, the ALJ's failure to find that plaintiff had a severe vocal cord impairment was not harmless error. The ALJ found that plaintiff suffered from three severe impairments: COPD, a major depressive disorder, and an anxiety disorder. (Tr. 17). To account for the functional limitations imposed by her impairments, the ALJ restricted plaintiff to light work that involved a "static set of tasks without fast pace," no more than superficial interaction with others, and no concentrated exposure to temperature extremes, humidity, fumes, odors, dust and gases. (Tr. 20). The ALJ did not consider whether plaintiff's vocal cord impairment imposed additional functional limitations, notwithstanding the state agency physicians' assessment of speaking limitations. In light of the ALJ's complete failure to address whether plaintiff's vocal cord impairment imposed any functional limitations, plaintiff's third assignment of error should be upheld.

### 4. Fourth assignment of error: The ALJ's hypothetical to the VE

Plaintiff alleges as her fourth assignment of error that the ALJ relied on an improper hypothetical to the VE that does not constitute substantial evidence of plaintiff's vocational abilities. (Doc. 12 at 16-17). Plaintiff alleges that the ALJ erred by failing to give controlling weight to Dr. Baula's opinion that she would miss more than four days of work per month as a result of her impairments or treatment, which plaintiff alleges was consistent with Ms. Whitecar's functional assessment, and to include that limitation in the hypothetical posed to the VE. Plaintiff notes that according to the VE, no jobs would be available to an individual who missed four or more days of work each month. (Tr. 55).

Resolution of whether the ALJ failed to properly account for plaintiff's limitations in the hypothetical to the VE may be impacted by the ALJ's reevaluation of the medical opinion evidence and other evidence on remand. Accordingly, it is not necessary to address plaintiff's fourth assignment of error at this time. The ALJ should elicit additional vocational testimony on remand if warranted.

### III. Conclusion

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the Court notes that all essential factual issues have not been resolved in this matter, nor does the current record adequately establish plaintiff's entitlement to benefits as of her alleged onset date. *Faucher v. Sec'y of H.H.S.,* 17 F.3d 171, 176 (6th Cir. 1994). This matter should be reversed and remanded for further proceedings with instructions to the ALJ to re-weigh the psychological evidence in accordance with this decision and to further develop the medical and vocational evidence as warranted.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

LISA DEATON,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-947
Black, J.
Litkovitz, M.J.

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

**IT IS THEREFORE RECOMMENDED THAT:**

The ALJ's decision be **REVERSED** and **REMANDED** for further proceedings

consistent with this opinion.

Date: 12/9/17

Karen L. Litkovitz
United States Magistrate Judge